IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

SANITARY BOARD OF THE
CITY OF CHARLESTON, WEST VIRGINIA,

    Plaintiff,

v.                                               Civil Action No. 2:16-cv-03060

GINA MCCARTHY, in her official capacity as the
Administrator of the United States Environmental
Protection Agency; and
UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

    Defendants.

## SUPPLEMENTAL COMPLAINT

The Sanitary Board of the City of Charleston, West Virginia ("Plaintiff" or "Charleston Sanitary Board"), files this Supplemental Complaint and alleges as follows:

## INTRODUCTION

1. This Supplemental Complaint is submitted pursuant to Rule 15(d) of the Federal Rules of Civil Procedure and the Court's order of October 20, 2016 (Doc. 20). This supplemental pleading is based on unlawful agency action by Defendants Gina McCarthy and the United States Environmental Protection Agency (collectively, "EPA") that occurred after Plaintiff's Complaint was filed on March 31, 2016.

2. The statements, allegations, and claims in Plaintiff's Complaint (Doc. 1) are re-alleged and incorporated by reference herein.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over these supplemental claims pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws of the United States

and pursuant to the Administrative Procedure Act's provisions for judicial review of final agency action at 5 U.S.C. §§ 701–706. *See Friends of the Earth v. EPA*, 333 F.3d 184, 189 (D.C. Cir. 2003) ("[O]riginal jurisdiction over EPA actions not expressly listed in [33 U.S.C. §] 1369(b)(1) lies . . . with the district court.").

4. The requested relief is proper under 28 U.S.C. § 2201 (declaratory relief), § 2202 (injunctive relief), and 5 U.S.C. § 706 (remedies for unlawful agency action).

5. Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391(e)(1) and 5 U.S.C. § 703 because Plaintiff resides in Charleston, West Virginia.

## STATEMENT OF FACTS

**A. Two EPA-Recommended Methods for Developing Site-Specific Water Quality Criteria for Copper: The WER and BLM Procedures**

6. EPA has developed two protocols that are available for states to adopt and use in developing site-specific water quality criteria for copper tailored to individual waterbodies: the (1) water-effect ratio ("WER") procedure last revised in 2001 and (2) biotic ligand model ("BLM") method published in 2003.

7. Significantly, the WER procedure has been adopted by West Virginia in its water quality standards regulation as the method for developing site-specific water quality criteria for copper. W. Va. Code R. § 47-2-8.5. The BLM procedure has not been adopted by West Virginia.

8. EPA approved the adoption of the WER procedure into West Virginia's water quality standards regulation. *See* 63 Fed. Reg. 53911, 53913 (Oct. 7, 1998) (approving revisions to West Virginia's water quality standards regulation, including addition of W. Va. Code R. § 46-1-8.4 (now codified at § 47-2-8.5)).

9. EPA Region 3, which has jurisdiction over the states of Delaware, Maryland, Pennsylvania, Virginia, and West Virginia, as well as the District of Columbia, has approved numerous site-specific copper standards derived using the WER procedure.

10. The BLM procedure is an alternative method developed by EPA for calculating site-specific copper standards. On information and belief, no state within the jurisdiction of EPA Region 3 has adopted any site-specific copper criteria using the BLM procedure since the method was published in 2003.

11. Although the BLM method is somewhat newer, EPA has affirmed that the WER procedure remains available for use by states: "In situations where states or tribes choose not to use the BLM, <u>the state (or tribe) may continue to use the WER method as a means of developing site-specific criteria</u>." EPA, Training Materials on Copper BLM: Implementation (emphasis added);[1] *see also* EPA, Water Quality Criteria Supplementary Training Materials – Permitting Issues, https://www.epa.gov/wqc/supplementary-training-materials-permitting-issues (last visited Nov. 11, 2016) (continuing to list the full (1994) and streamlined (2001) WER protocols as "guidance documents . . . available for assistance in establishing copper criteria and permit limits for copper"); EPA, Water Quality Standards Handbook 52–53 (rev. 2014) (outlining state options for using WER procedure to adjust water quality criteria).[2]

12. The WER procedure remains a "scientifically defensible method" for developing water quality criteria within the meaning of 40 C.F.R. § 131.11(b)(1)(iii).

13. In fact, the WER procedure is so well-accepted that EPA continues to authorize states to incorporate it directly into their water quality standards equations for copper. For

---

[1] *Available at* https://www.epa.gov/sites/production/files/2015-11/documents/copper-implementation-training.pdf.
[2] *Available at* https://www.epa.gov/sites/production/files/2014-10/documents/handbook-chapter3.pdf.

example, the recently revised acute criterion for copper in North Carolina's water quality standards regulation is a formula that multiplies (1) a WER value *times* (2) the standard hardness-adjusted copper criteria value. 15A N.C. Admin. Code § 02B.0211(11)(b) & tbl. A ("WER * [0.960*e^{0.9422[ln hardness]-1.700}]"). Because the WER procedure is incorporated into the EPA-approved formula for calculating copper criteria in North Carolina, the state is not required to submit each site-specific criterion to EPA for review under 33 U.S.C. § 1313(c). EPA approved the incorporation of the WER procedure into North Carolina's copper criteria in April 2016. Letter from Heather McTeer Toney, EPA Region 4, to Jay Zimmerman, N.C. Dep't of Env't & Natural Res. 2, 10–11 (Apr. 6, 2016) (finding that the state's WER-based formula for calculating copper criteria is "scientifically defensible");[3] *see also* Letter from Karen Flournoy, EPA Region 7, to Sara Parker Pauley, Mo. Dep't of Natural Res. (May 14, 2015) (approving similar incorporation of WER procedure into water quality criteria for copper in Missouri).

    **B.**    **WER Procedure Used to Develop the CSB Copper Standard**

14. Consistent with W. Va. Code R. § 47-2-8.5, the site-specific copper criteria at issue here ("CSB Copper Standard") was developed using the WER procedure. The final calculated WER value is 5.62.

15. The study and underlying data explaining the derivation of the WER value of 5.62 were provided to EPA for technical review in 2014. EPA provided responsive comments to the West Virginia Department of Environmental Protection ("WVDEP") in a July 21, 2014 letter from Evelyn MacKnight, EPA Region 3, stating:

> The U.S. EPA is supportive of . . . the copper water effect ratio (WER) for the Sanitary Board for the City of Charleston (47CSR2 7.2.d.19.2). EPA has reviewed the information on how the WER was derived and find that it is consistent with

---

[3] *Available at* https://ncdenr.s3.amazonaws.com/s3fs-public/documents/files/ResponseLetter.pdf.

<u>EPA current guidance in the March 2001 Streamlined Water-Effect Ratio Procedure for Discharges of Copper</u> (EPA-822-R-01-005).

(emphasis added).

16. The CSB Copper Standard, including the WER value of 5.62, was approved by the West Virginia Legislature as an amendment to West Virginia's water quality standards regulation and signed by Governor Tomblin in March 2015. It was codified at W. Va. Code R. § 47-2-7.2.d.19.2.

17. The State submitted the site-specific CSB Copper Standard to EPA for review in accordance with 33 U.S.C. § 1313(c) on or about June 25, 2015.

18. The Clean Water Act required EPA to notify West Virginia within 60 days if the CSB Copper Standard met the statutory requirements or disapprove it within 90 days—that is, on or about October 2, 2015—if it failed to meet the requirements. 33 U.S.C. § 1313(c)(3); 40 C.F.R. §§ 131.21(a).

**C.  EPA Declined to Issue a Timely Decision on the CSB Copper Standard Decision Due to Ongoing Consultation with USFWS**

19. EPA initiated informal consultation with the U.S. Fish and Wildlife Service ("USFWS") regarding the CSB Copper Standard on or about May 15, 2015.

20. USFWS informed EPA that it would not concur with the CSB Copper Standard until WVDEP had completed a survey for federally listed mussel species in the Kanawha River in the vicinity of Charleston Sanitary Board's outfall.

21. As of the date on which EPA had a nondiscretionary duty to conclude its review of the CSB Copper Standard, the mussel survey requested by USFWS had not been conducted. EPA therefore had not concluded its informal consultation with USFWS.

22. EPA failed to complete its review of the CSB Copper Standard within the statutorily mandated timeframe.

23. In a letter dated October 2, 2015, EPA informed the State that it "is still considering the potential impact of this site-specific criterion [the CSB Copper Standard] on federally listed threatened and endangered species and is not taking a CWA 303(c)(3) action at this time."

24. EPA's decision to ignore the statutory deadline was based on the fact that EPA had initiated informal consultation with USFWS regarding the CSB Copper Standard and USFWS declined to concur with the site-specific standard until a mussel survey could be completed.

**D.  EPA First Expresses Concern about Technical Derivation or Protectiveness of the WER Value Only after Litigation Commenced**

25. Charleston Sanitary Board served EPA with a 60-day Notice of Intent to file this action on December 18, 2015. This put EPA on notice that its failure to timely approve the CSB Copper Standard was unlawful because, among other things, "[w]hether or not USFWS approves of proposed state water quality standards is not a relevant criterion that EPA may consider when it reviews proposed state water quality standards." (Doc. 1-1 at 4).

26. Following service of the Notice of Intent, EPA continued to press WVDEP to complete the mussel survey requested by USFWS. For example, Denise Hakowski, EPA Region 3, emailed Laura Cooper, WVDEP, and Janet Clayton, W. Va. Department of Natural Resources, on February 12 and 18, 2016 inquiring into the status of the State's plan to conduct the survey.

27.  On information and belief, EPA staff first communicated its intent to use the BLM procedure to generate a value to compare against the approved WER value of 5.62 in the CSB Copper Standard on March 1, 2016. On that date, Ms. Hakowski sent an email to Ms. Cooper and Kevin Coyne, WVDEP, in which she stated: "I imagine my voicemail is a little

confusing . . . . Basically, I'm trying to pull out of the CSB data submitted the information needed to calculate a BLM. . . . ."

28. On information and belief, the planned dates for the mussel survey were not communicated by WVDEP to EPA until April 22, 2016.

29. On information and belief, it was not until <u>after</u> Charleston Sanitary Board filed its Complaint in this action that EPA first expressed to WVDEP or Charleston Sanitary Board any purported technical concerns about the derivation of the CSB Copper Standard or whether the WER value of 5.62 is protective of aquatic life in the Kanawha River. These purported concerns were first communicated to WVDEP in a letter from Ms. MacKnight to Scott Mandirola, WVDEP, in a letter dated May 12, 2016.

30. The mussel survey conducted by WVDEP was completed on or about June 7, 2016.

### E. EPA Disapproves the CSB Copper Standard

31. On July 19, 2016, EPA sent a letter to Hon. Randy Huffman, Secretary of WVDEP, disapproving the CSB Copper Standard. (Doc. 15-1).

32. The disapproval letter did not find that the WER procedure used to develop the CSB Copper Standard is not scientifically defensible. Nor did the letter identify any errors in how the WER procedure was applied.

33. Instead, EPA's disapproval letter objects, for the first time, to the magnitude of the WER value of 5.62.

34. Despite expressing no reservations about the WER value until after litigation had commenced, EPA claims in the disapproval letter that an Agency guidance document from 1994 provides that WER values greater than 5 "should be subject to particular investigation because they could present anomalies."

35. EPA's rationale for disapproving the CSB Copper Standard is unprecedented and inconsistent with longstanding practice in EPA Region 3. On information and belief, EPA Region 3 has never disapproved a state-submitted WER value adopted as a state water quality criterion or site-specific permit limit on the grounds that it is greater than 5.

36. To the contrary, EPA Region 3 has consistently approved WER values greater than 5 adopted as state water quality criteria or site-specific permit limits. In Region 3's home State of Pennsylvania, for example, it has approved at least eight current site-specific copper criteria with WER values greater than 5. *See* Pa. Dep't of Envtl. Prot., Site Specific Water Quality Criteria in Pennsylvania (Nov. 2015).[4]

37. In fact, EPA Region 3 has approved copper WER values as high as 15.7, in the case of a site-specific permit limit for Louisa Regional Sewage Treatment Plant approved in 2009.

38. The sole method of "particular investigation" employed by EPA to review the CSB Copper Standard was to calculate a BLM value using the water quality sampling data generated for the CSB Copper Standard's WER study.

39. To calculate a BLM value, 11 water quality parameters (e.g., dissolved organic carbon, pH, alkalinity) from water sample results are entered into a model. However, EPA did not have data for all 11 parameters to generate its BLM value because the WER procedure used to generate the CSB Copper Standard has different sampling requirements. Accordingly, EPA's BLM calculation used highly conservative assumed values (e.g., 10th percentile ecoregional values)—rather than actual water sample results from the Kanawha River and Charleston Sanitary Board's effluent—for 6 of the 11 parameters.

---

[4] *Available at* http://www.dep.pa.gov/Business/Water/PointNonPointMgmt/WaterQuality/Pages/Site-Specific-Water-Quality-Criteria-In-PA.aspx.

40. In its disapproval letter, EPA compares the resulting BLM value of approximately 2—calculated with the incomplete data—against the WER value of 5.62 produced by the WER study for the CSB Copper Standard.

41. On information and belief, EPA Region 3 has never disapproved a WER value adopted as a state water quality criterion on the grounds that it is higher than a separately calculated BLM value.

## SUPPLEMENTAL CLAIMS FOR RELIEF

### COUNT III:
### EPA's Disapproval of the CSB Copper Standard
### Was Arbitrary and Capricious
### (5 U.S.C. § 706(2)(A))

42. Plaintiff incorporates by reference and realleges all of the preceding paragraphs of this Supplemental Complaint.

43. Agency action, findings and conclusions must be held unlawful and set aside if found to be arbitrary and capricious. 5 U.S.C. § 706(2)(A).

44. EPA's action here is arbitrary and capricious because the Agency failed to articulate a satisfactory and lawful explanation that included a rational connection between the facts and the Agency's decision to disapprove the CSB Copper Standard. Further, EPA's decision runs counter to the evidence and longstanding agency practice and procedure, and is so implausible that it cannot be ascribed to a difference in view or agency expertise.

45. To the contrary, EPA's explanation for its disapproval decision appears to be a post hoc rationalization crafted solely to support its litigation position in this action.

## COUNT IV:
## EPA's Disapproval of the CSB Copper Standard
## Was Contrary to Law and In Excess of Statutory Authority
## (5 U.S.C. § 706(2)(A), (C))

46. Plaintiff incorporates by reference and realleges all of the preceding paragraphs of this Supplemental Complaint.

47. Agency action, findings and conclusions must be held unlawful and set aside if found to be in excess of statutory authority or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A), (C).

48. The Clean Water Act mandates that EPA "shall" approve any state-submitted water quality standard that "meets the requirements of [the Clean Water Act]" within 60 days of submission of such standard by the state. 33 U.S.C. § 1313(c)(3); *see also* 40 C.F.R. §§ 131.21(b), 131.5(b).

49. Where a state develops numeric water quality criteria as part of its water quality standards, EPA's regulations require that the criteria values be based on EPA's "304(a) Guidance modified to reflect site-specific conditions" or "[o]ther scientifically defensible methods." 40 C.F.R. § 131.11(b)(1).

50. The CSB Copper Standard was developed using an EPA-developed WER procedure to modify the recommended criteria in EPA's 304(a) Guidance to site-specific conditions in the Kanawha River. The criteria meet all the requirements of the Clean Water Act.

51. EPA's disapproval was based on unlawful considerations beyond the exclusive review criteria prescribed by 33 U.S.C. § 1313(c)(3) and its implementing regulations.

52. EPA's disapproval of the CSB Copper Standard was in excess of its statutory authority and contrary to law.

# COUNT V:
## EPA's Disapproval of the CSB Copper Standard
## Was Without Observance of Procedure Required by Law
## (5 U.S.C. § 706(2)(A), (C), (D))

53. Plaintiff incorporates by reference and realleges all of the preceding paragraphs of this Supplemental Complaint.

54. Agency action, findings and conclusions must be held unlawful and set aside if found to be undertaken without observance of procedure required by law. 5 U.S.C. § 706(2)(D).

55. The statutory process for EPA review of state water quality standards is prescribed by Congress. EPA must approve any state-submitted water quality standard within 60 days if it meets the statutory requirements or disapprove such standard within 90 days if it fails to meet the necessary requirements. 33 U.S.C. § 1313(c)(3); 40 C.F.R. §§ 131.21(a).

56. EPA has no lawful authority to unilaterally and indefinitely extend this statutory review period in order to gather additional information upon which to base its decision. EPA's decision must be limited to the information available to it at the statutory time prescribed for the mandatory decision.

57. EPA failed to follow the procedure required by law by indefinitely extending the statutory review period to complete informal consultation with USFWS, await the results of a mussel survey requested by USFWS, and gather additional data to run an independent BLM model analysis.

58. EPA further failed to follow the procedure required by law by basing its decision information developed after the end of the statutory review period.

## SUPPLEMENTAL PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sanitary Board of the City of Charleston, West Virginia, respectfully prays that this Court:

(a) Declare that EPA's action disapproving the CSB Copper Standard was arbitrary and capricious, contrary to law, in excess of statutory authority, and/or without observance of proper procedure.

(b) Vacate EPA's action disapproving the CSB Copper Standard and remand the same to EPA with appropriate instructions.

(c) Grant such other relief as the Court may deem appropriate.

Respectfully submitted,

SANITARY BOARD OF THE CITY OF
CHARLESTON, WEST VIRGINIA

By Counsel:

/s/ F. Paul Calamita
F. Paul Calamita (WV Bar No. 8789)
AQUALAW PLC
6 S. 5th Street
Richmond, Virginia 23219
paul@aqualaw.com
(804) 716-9021 (phone)
(804) 716-9022 (fax)

Dated: November 17, 2016

# CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing Supplemental Complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants:

Chloe H. Kolman
U.S. Department of Justice
Environmental Defense Section
Suite 800
601 D Street, NW
Washington, DC 20004

Sarah A. Buckley
U. S. Department of Justice
P.O. Box 7611
Washington, DC 20044

Gary L. Call
U.S. Attorney's Office
P.O. Box 1713
Charleston, WV 25326-1713

/s/ F. Paul Calamita
F. Paul Calamita

Dated: November 17, 2016