**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

SANITARY BOARD OF THE
CITY OF CHARLESTON, WEST VIRGINIA,

        Plaintiff,

        v.                                  Civil Action No. 2:16-cv-03060

SCOTT PRUITT, in his official capacity as the
Administrator of the United States Environmental
Protection Agency; and
UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

        Defendants.

**MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Sanitary Board of the City of Charleston, West Virginia (CSB) respectfully submits this memorandum in support of its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## I.  SUMMARY OF ARGUMENT

This is a very narrow, clear cut, and baffling case of an arbitrary and capricious disapproval by the U.S. Environmental Protection Agency (EPA) of the West Virginia Department of Environmental Protection's (WVDEP) site-specific copper standard for a section of the Kanawha River into which CSB discharges.

CSB operates a publicly-owned wastewater treatment plant that provides service to approximately 25,000 residents in the City of Charleston and adjacent areas of Kanawha County. The treatment plant's wastewater discharge includes trace amounts of copper. CSB worked with WVDEP, in coordination with EPA, to revise West Virginia's water quality standards regulation to ensure that the copper water quality criteria applicable to CSB's discharge is appropriately

tailored to the specific conditions of the Kanawha River.  To do so, CSB performed a Water Effect Ratio (WER) study—a procedure developed by EPA and adopted into WVDEP's water quality standards regulation.

EPA was fully supportive of CSB using its WER methodology to develop the site-specific copper criteria. That is no surprise given that the EPA WER methodology is expressly included in the West Virginia water quality standards regulation. EPA has repeatedly approved this regulation (including the WER procedure) pursuant to its Clean Water Act oversight responsibilities.  Dozens of WERs have been performed prior to the WER for CSB and EPA approved each one without any objection.

The result using EPA's WER was 5.62—meaning that the site-specific numeric copper criteria to protect aquatic life in the Kanawha River would be 5.62 times the default national copper standard. EPA reviewed and supported this result in its own public comments when the State adopted this result into the State's water quality standards regulation through notice and comment rulemaking. EPA voiced no objection whatsoever when the West Virginia Legislature then adopted the water quality standards regulation update as a State legislative rule (codified at W. Va. Code R. § 47-2-7.2.d.19.2 and referred to herein as "WER-Adjusted Copper Standard"). If EPA felt, that for the first time any verification of their own WER procedure was necessary, they had ample opportunities to say so. Their silence was deafening when it mattered in terms of the validity of the WER result.

One year after the West Virginia Legislature acted, many months past its Congressional deadline, and in the face of this lawsuit by CSB to force EPA to act on WVDEP's water quality standards regulation update, EPA, for the first time, announced that the WER was technically suspect because the WER result was greater than another EPA translator method (Biotic Ligand

Method, or BLM). EPA on its own initiative partially applied the BLM to the Kanawha River. Based upon information and belief, EPA has never asserted that a WER has to match a BLM result. In fact, EPA admits that no BLM has ever been performed for copper in EPA Region 3. No other WER has been required to be validated by the BLM procedure. Significantly, the West Virginia water quality standards regulation only includes the WER methodology and not the BLM.  EPA has repeatedly approved West Virginia's water quality standards regulation with only the WER procedure.

EPA cannot require, for the first time ever, with no notice, that the WVDEP's WER-adjusted Copper Standard must be confirmed by an unpromulgated and untested BLM procedure. This is legally wrong in that it would place the unpromulgated BLM method above the promulgated WER procedure. It is also arbitrary and capricious in that EPA has not required any WER to date in Region 3 to be verified using the BLM procedure. Adding insult to injury, EPA's "application" of the untested BLM for the segment of the Kanawha River in question saw only five of eleven waterbody-specific inputs come from actual Kanawha River data. The other six BLM inputs were taken from literature values of regional averages by EPA rather than river-specific information. It was arbitrary and capricious for EPA to require the application of the BLM instead of the WER in this one isolated instance and even more so given EPA's use of six of eleven BLM inputs that were not based upon Kanawha River-specific information—the whole point of the exercise.  For these reasons, EPA's rejection of the WER is arbitrary and capricious and must be reversed.

## II.  BACKGROUND

### A.  West Virginia Adopted EPA's National Default Copper Criteria for the Kanawha River

Under the Clean Water Act (CWA), West Virginia is responsible for developing water quality standards for its rivers and lakes. *See Piney Run Preservation Ass'n v. Cnty. Comm'r of Carroll Cnty*, 268 F.3d 255, 266 n.9 (4th Cir. 2001); *see also* 40 C.F.R. § 131.4(a). Water quality standards primarily consist of "designated uses" (e.g., fishing, swimming, public water supply) for each of navigable waterbody and "water quality criteria" (e.g., maximum pollutant concentrations) that the waterbody must attain to fulfill those designated uses. 33 U.S.C. § 1313(c)(2)(A).[1]

One of the Kanawha's designated uses is the "Propagation and Maintenance of Fish and Other Aquatic Life." W. Va. Code R. § 47-2-6.1. WVDEP has promulgated numerous water quality criteria—including maximum copper levels—to ensure that the Kanawha is suitable for aquatic life. W. Va. Code R. § 47-2, App. E, Tbl. 1, § 8.10. Those copper criteria are based on very conservative, one-size-fits-all, nationwide, recommended copper criteria developed by EPA. EPA Ans. ¶ 21.

### B.  West Virginia's Regulations Permit the Development of "Site-Specific" Copper Criteria Tailored to the Specific Conditions and Chemistry of the Kanawha River Using EPA's "Water Effect Ratio" Procedure

EPA's nationwide recommended copper criteria are not tailored to the site-specific conditions and chemistry of individual rivers, which can significantly affect the toxicity of copper to aquatic life. According to EPA guidance: "The national recommended criterion for copper has now taken on the role of a screening tool. Violation of that criterion does not usually trigger

---

[1] The other components of water quality standards—an antidegradation policy (40 C.F.R. § 131.12) and general polices (40 C.F.R. § 131.13)—are not relevant to this action.

immediate pollution control, but rather triggers WER [water effect ratio] studies to derive a site-specific value for the criterion." *Streamlined Water-Effect Ratio for Discharges of Copper* 31 (Mar. 2001) ("*Streamlined WER*"), AR 435.[2] A WER study is used to determine how effectively a river's water chemistry reduces the toxicity of dissolved copper to aquatic life. *Streamlined WER* 1, AR 405. The resulting WER, is expressed as a single number. That number is multiplied by EPA's nationwide recommended copper criteria to produce tailored, site-specific copper criteria for the segment of the river studied. AR 442. The WER-adjusted criteria are intended to provide the same level of protection for aquatic life as the default nationwide recommended criteria. EPA Ans. ¶ 24; *see also* EPA, *Use of Water-Effect Ratio in Water Quality Standards* 3 (Feb. 22, 1994), AR 577 ("Site-specific criteria, properly determined, will fully protect existing uses.").

WVDEP has adopted EPA's approach outlined above. The State's water quality standards regulation provides that the national recommended copper criteria may be tailored to the specific conditions in each river. W. Va. Code R. § 47-2-8.5. EPA's WER methodology is the *only* pre-approved methodology referenced in the State's regulation for this purpose. *Id*. EPA approved the adoption of the WER procedure into West Virginia's water quality standards regulation. 63 Fed. Reg. 53911, 53913 (Oct. 7, 1998) (approving revisions to West Virginia's water quality standards regulation, including addition of W. Va. Code R. § 46-1-8.4 (now codified at § 47-2-8.5)).

## C. CSB Coordinates with WVDEP to Develop and Promulgate Site-Specific Copper Criteria for the Kanawha River with Review and Support by EPA

In 2013, CSB, in consultation with WVDEP, commenced a WER study for the Kanawha River at the location of CSB's wastewater treatment plant. AR 1198. EPA was involved from an early stage. EPA first reviewed the draft WER study plans in November 2013. AR 1241, AR 1253.

---

[2] References to the administrative record are cited as "AR."

The WER tests were subsequently performed and results forwarded to EPA. AR 1253. Both times, EPA responded with technical comments and questions, all of which were addressed (as documented by WVDEP). AR 1253–54. Importantly, EPA noted no objections or concerns about the WER study or its results. Following several years of work and collaboration with WVDEP, the study resulted in a WER of 5.62. *Id*.

WVDEP published the proposed WER-adjusted Copper Standard in the West Virginia Register for public notice and comment on June 6, 2014, and forwarded the package to EPA for review. AR 19. EPA issued a letter to WVDEP on July 21, 2014 with the following conclusion:

> The U.S. EPA is supportive of . . . the copper water effect ratio (WER) for the Sanitary Board for the City of Charleston (47CSR2 7.2.d.19.2). EPA has reviewed the information on how the WER was derived and find that it is consistent with EPA current guidance in the March 2001 *Streamlined Water-Effect Ratio Procedure for Discharges of Copper* (EPA-822-R-01-005). Our only comment would be that the regulation needs to specify whether it is a dissolved or total recoverable WER.[3]

*Id*. (emphasis added). For the second time, EPA raised no concerns about the WER beyond a clarification as to how it would be expressed (which was resolved by WVDEP).

Encouraged by EPA's support, in August, 2014, WVDEP approved (via notice and comment rulemaking) the proposed WER-adjusted Copper Standard for the segment of the Kanawha River which CSB discharges into. AR 901. The proposed rule was then approved by the West Virginia Legislature as an amendment to West Virginia's water quality standards regulation and signed by Governor Tomblin in March 2015. *Id*. Codified at W. Va. Code R. § 47-2-7.2.d.19.2, this rule provides:

---

[3] WVDEP revised the proposed rule in response to EPA's "only comment" to clarify that it applies to "total recoverable copper." AR 1196.

Pursuant to 46 CSR 6, a Copper Water Effect Ratio (WER) of 5.62 shall be applied to The Sanitary Board of the City of Charleston, West Virginia wastewater treatment plant discharge of total recoverable copper to Kanawha River, Zone 1.

**D. Despite Finding No Flaws in the WER-Adjusted Copper Standard, EPA Unlawfully Failed to Conclude Its CWA § 303(c) Review Within the Statutory Timeframe**

The CSB Copper Standard and supporting WER report were *again* submitted to EPA on June 25, 2015 for the formal CWA § 303(c), 33 U.S.C.  1313(c), review. AR 895. EPA had no more than 90 days to conclude that review and issue a determination. 40 C.F.R. § 131.21(a). EPA issued a letter to WVDEP on or about the ninetieth day (October 2, 2015) declining to make a determination on the WER-Adjusted Copper Standard. AR 17.

**E. EPA Unexpectedly Changes Positions Again in Response to a Legal Challenge by CSB to Disapprove the WVDEP's WER-Adjusted Copper Standard Based on the Grounds that the WER Value Was Higher than the Result EPA Calculated Using a Different Methodology (the BLM Procedure)**

After unsuccessful efforts to get EPA to act pursuant to its statutory obligation, CSB served EPA with a 60-day Notice of Intent to file this action on December 18, 2015. (Doc. 1-1). The notice demanded that EPA issue its overdue determination. Two months after the Notice of Intent was filed, EPA staff indicated *for the first time* in an email to WVDEP that it planned to calculate an alternative criteria value using the BLM method. AR 1308 ("I imagine my voicemail is a little confusing. . . . Basically, I'm trying to pull out of the CSB data submitted the information needed to calculate a BLM."). The BLM is an alternative method for calculating site-specific copper criteria that also was developed by EPA. Unlike the WER used to develop the WER-Adjusted Copper Standard, the BLM methodology has not been incorporated into West Virginia's water quality standards regulation as an acceptable method for developing site-specific criteria. *See* W. Va. Code R. § 47-2-8.5.

Significantly, EPA did not even have all of the data necessary to properly calculate a BLM. AR 11. To calculate a BLM, water from the river is sampled for 11 parameters (e.g., pH,

temperature, dissolved organic carbon) and the results for each of the 11 parameters are plugged into a model to generate the predicted BLM value. Here, EPA had only **5** of the 11 parameters available. *Id*. For the remaining parameters needed to generate its competing "site-specific" BLM value, EPA allegedly plugged in average values from rivers in the region. *Id*.

On July 19, 2016, EPA notified WVDEP that it had disapproved the WER-Adjusted Copper Standard. AR 1. The letter explains that EPA used data from CSB's WER study to generate strawman criteria using the BLM method. AR 2, 11. The disapproval letter did not find that the WER procedure used to develop the CSB Copper Standard is scientifically indefensible. Nor did the letter identify any errors in (1) the data used for the WER study, (2) the application of the WER methodology to that data to generate the WER value of 5.62, or (3) EPA's previous reviews of the WER study. Instead, the sole basis of EPA's disapproval is that it considers the result it produced using the *unpromulgated* BLM method to be a "superior indicator of protectiveness" than the WER method that remains the only approved method in West Virginia's regulations. AR 12. As we explain below, the test of whether to approve WVDEP's WER-Adjusted Copper Standard is not whether EPA can find a superior indicator of protectiveness out there (especially an unused and unpromulgated one) but whether there was a sound scientific basis for WVDEP's WER-Adjusted Copper Standard—and there can be no question that there was such a basis in this instance.

### III.  STANDARD OF REVIEW

A party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the [party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because the claims in this action arise under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), the "only material facts are those contained in the administrative record." *Ohio Valley Envtl. Coal. v. Horinko*, 279 F. Supp. 2d 732, 742 (S.D. W. Va. 2003). The APA mandates that

agency action be set aside if it is arbitrary and capricious, not in accordance with law, or without observance of lawful procedure. 5 U.S.C. § 706(2)(A), (C), (D).

## IV. ARGUMENT

EPA's disapproval of the CSB Copper Standard was unlawful and should be vacated for three reasons. First, the record evidences an inconsistent, self-contradictory, and unsupported decision by EPA which is the definition of arbitrary and capricious agency action. Second, EPA's disapproval was contrary to law because it relied on an EPA *preference* for the unpromulgated BLM methodology over the promulgated WER procedure, rather than on one of the exclusive statutory criteria which EPA is supposed to apply when reviewing WVDEP's WER-Adjusted Copper Standard. Third, EPA's action represented an abuse of the CWA § 303(c) procedure required by Congress.

### A. EPA's Disapproval of the CSB Copper Standard Was Arbitrary and Capricious

EPA's rationale for disapproving the CSB Copper Standards "runs counter to the evidence before the agency" and is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Hughes River Watershed Conservancy v. Johnson*, 165 F. 3d 283, 288 (4th Cir. 1999). Because EPA's position on the WER-Adjusted Copper Standards veered from acceptance to rejection with no rational or defensible basis for its change, it must be vacated as arbitrary and capricious.

#### 1. No Justification Is Given for EPA's Sudden and Unexpected Change in Position and WER-Acceptance Practice

EPA disapproved the WER-Adjusted Copper Standard on July 19, 2016, explaining that the WER value was greater than 5 and, accordingly, was "implausible." AR 12. The sole reason for this this conclusion is that the WER value was higher than a modified (using only five of eleven actual Kanawha River inputs) BLM value generated by EPA. *Id*. This marked a sudden,

unexpected, and unprecedented contradiction to EPA's previous statements and conclusions on the record.

Prior to the disapproval, there was no new data or information that would cast doubt on the WER study or the WER-Adjusted Copper Standard upon which it was based, and EPA never expressed concerns with it. The record reveals no reason for EPA's reversal from its "supportive" June 2014 review finding the underlying technical information fully consistent with EPA guidance. Only *after* CSB commenced the instant litigation and forced EPA to act did the Agency go to unprecedented lengths in performing a "back-of-the-envelope" BLM to create alternative grounds to disapprove.[4]

EPA gave no reason for its material changes in position from June 2014 (fully supportive of WVDEP's WER-Adjusted Copper Standard and WER value of 5.62) to July 2016 (WER value too high to plausibly be protective of aquatic life). Having failed to resolve these glaring inconsistencies in the record, EPA's arbitrary and capricious conclusion and rationale run "counter to the evidence before the agency." *Hughes*, 165 F.3d at 288.

2. **EPA Provides No Reasonable Basis for Elevating the Results of an Unpromulgated BLM Based on Insufficient Data Over the Results Produced by a Valid Application of the Promulgated WER Methodology**

Although EPA's decision bears the imprimatur of expert scientific analysis, there is nothing behind the curtain. Upon a "searching and careful review inquiry of the record" to "comprehend the meaning of the evidence relied upon and the evidence discarded," *Ohio Valley Envtl. Coal. v. Aracoma Coal Co*., 556 F.3d 177, 192 (4th Cir. 2009), it becomes readily apparent that EPA's

---

[4] Although the arbitrary and capriciousness standard is highly deferential, there are sound reasons why "deference is . . . unwarranted when there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question.'" *Christopher v. SmithKline Beecham Co*rp., 132 S. Ct. 2156, 2166 (2012) (quoting *Auer v. Robbins*, 519 U.S. 452, 462 (1997)).

decision rationale lacks any rational justification. EPA rejected site-specific copper criteria that were duly promulgated by West Virginia notwithstanding that, by EPA's own admission, the criteria were generated through a valid application of the WER methodology that EPA developed and EPA approved for this very purpose when West Virginia incorporated it into its water quality standards regulation. There is no justification for rejecting the WER-Adjusted Copper Standard simply because a single BLM value produced a different result.

### a. EPA Region 3's Established Precedent Is to Approve WERs—Including WERs Greater Than 5

EPA's characterization of WVDEP's WER-Adjusted Copper Standard greater than 5 as implausible and unprotective, AR 12, is inconsistent with its longstanding practice within EPA Region 3.[5] EPA concedes that it has never "disapproved a state water quality criterion or site-specific permit limit 'on the grounds that it is greater than 5.'" Supp. Ans. ¶ 35. In Pennsylvania, Region 3's home state, EPA admitted that it "reviews and accepts permit limits . . . that apply WER values greater than 5," and did not deny that as of November 2015, it approved eight such limits greater than 5 in Pennsylvania alone. Supp. Compl. ¶ 36; Supp. Ans. ¶ 36. Lastly, EPA stated that Region 3 "acknowledged the probable sufficiency" of a WER value of **15.7** in 2009. Compl. ¶ 37; Supp. Ans. ¶ 37.[6] EPA's decision rationale ignored Region 3's past practice and

---

[5] EPA Region 3, headquartered in Philadelphia, has authority over West Virginia, Virginia, Maryland, Pennsylvania, Delaware, and the District of Columbia.

[6] CSB attaches to its Motion the (1) Table of Site Specific Water Quality Criteria in Pennsylvania obtained from the Pennsylvania Department of Environmental Protection's website and cited in paragraph 36 of the CSB's Supplemental Complaint and (2) an email from Cheryl Atkinson, EPA Region 3, which was obtained from Defendant through a Freedom of Information Act request and which was cited in paragraph 37 of the Supplemental Complaint to support these statements. Both documents are public records and Defendant has acknowledged their existence. They are contemporaneous with EPA's decision on the CSB Copper Standard and are relevant because they evidence EPA Region 3's practice and precedent of accepting copper WER values greater than 5. CSB therefore requests that the Court take judicial notice of these public documents. *Cf. Ohio*

precedent of accepting site-specific WER values greater than 5. EPA's disapproval of WVDEP's WER-Adjusted Copper Standard is unprecedented.  EPA has not even attempted to provide a rationale as to why WVDEP's WER-Adjusted Copper Standard warrants unique scrutiny in comparison to all of the other WERs—including at least six that we found greater than "5"—it has approved without comment.

### b. EPA's Own Practice and Guidance Documents Contradict Its Criticism of the WER Methodology

EPA's decision document devotes several pages to criticizing the validity of the WER, AR 08–12, and arguing that the "BLM results represent a superior indicator of protectiveness," AR 12. EPA's own practice and guidance, however, say otherwise.

Although the BLM method is somewhat newer, EPA has affirmed in writing that the WER procedure remains available for use by states: "In situations where states or tribes choose not to use the BLM, *the state (or tribe) may continue to use the WER method as a means of developing site-specific criteria.*" EPA, *Training Materials on Copper BLM: Implementation* (emphasis added; hereinafter "*Training Materials on Copper BLM: Data Requirements*").[7] EPA's Water Quality Standards Handbook, revised in 2012, states that "[e]xisting guidance and practice are that EPA will approve site-specific criteria developed using appropriate procedures." EPA, *Water Quality Standards Handbook: Water Quality Criteria* 48, 53 (2012).[8] The Handbook continues to support the WER as an appropriate procedure. *Id.* at 53.

---

*Valley Envtl. Coal. v. McCarthy*, 3:15-cv-271, 2017 U.S. Dist. LEXIS 20392, at *24 n. 6 & 7 (S.D. W. Va. Feb. 14, 2017).

[7] *Available at* https://www.epa.gov/sites/production/files/2015-11/documents/copper-implementation-training.pdf.

[8] *Available at* https://www.epa.gov/sites/production/files/2014-10/documents/handbook-chapter3.pdf.

EPA has affirmed the WER's continued validity in deed as well. As noted above, there are numerous WER-derived copper standards in effect within the Region 3 states. Consistent with EPA's stated position that states have discretion to use either the WER or BLM, four of the six states in Region 3—including West Virginia—have retained the WER in their water quality standards regulations. *See* W. Va. Code R. § 47-2-8.5; DC. Mun. Regs. tit. 57, § 1106.3(a); 25 Pa. Code § 93.8d(c); 9 Va. Admin. Code § 25-260-140.F. When EPA promulgated copper criteria for California after the state failed to do so, EPA relied on the WER methodology. *See* 40 C.F.R. § 131.38(c)(4). In stark contrast, EPA admits that no state in Region 3 "has submitted for EPA's approval site-specific copper criteria using the BLM procedures." Supp. Ans. ¶ 10. EPA's repudiation of the WER in this case is an unexplained departure from longstanding past—*and present*—practice and precedent. EPA asks this Court to require WVDEP to use the untested and unpromulgated BLM procedure instead of the tried, true, promulgated, and scientifically valid WER procedure. EPA attempts no justification whatsoever for why a BLM (rather than WER) must be done for the Kanawha River and not for all of the other WERs which EPA has approved (and performed itself) over the years.

### c. EPA Identified No Errors in the CSB Copper Standard's WER Study

At bottom, the record demonstrates that the CSB Copper Standard was developed using an EPA methodology specifically designed to develop site-specific copper criteria in West Virginia. *See* AR 1198. The WER is specifically incorporated into WVDEP's Water Quality Standards Regulation for that very purpose. *See* W. Va. Code R. § 47-2-8.5. Both WVDEP and EPA found, on the record, that the data and methodology used to conduct the study and derive the WER value were error-free. *E.g.*, *id.*, AR 19. EPA's ultimate disapproval fails to reject its prior conclusion. EPA's stated conclusion that it is "implausible that CSB's WER-based criteria are protective of the state's designated use," AR 12, is contrary to any evidence in the record.

EPA has pointed to no evidence in the record or guidance indicating that a valid WER result generally, or this WER value specifically, is unprotective of aquatic life simply because the result varies from a result one might obtain from a different methodology—here the back-of-the-envelope EPA BLM value. Likewise, EPA has identified no guidance or precedent reflecting that WER values must be confirmed by a BLM value to be approved. If this was in fact the Agency's policy position (and not just the position it has taken in this litigation), EPA could have withdrawn its approval for the West Virginia regulation specifying the WER as the only approved method and withdrawn its own guidance which continues to cite the WER as a scientifically defensible method for developing site-specific copper criteria. It has taken neither action. Moreover, if that were the EPA's position, surely it would require that when conducting WERs, states also sample for all 11 BLM input parameters so that EPA could perform its confirming BLM using actual river data rather than literature values as EPA did in this case. *See* AR 11. EPA's stated rationale for disapproving the CSB Copper Standard is wholly inconsistent with EPA guidance and precedent, in addition to being inconsistent with the record.

## B.  EPA's Disapproval of WVDEP's WER-Adjusted Copper Standard Was Contrary to Law

### 1.  WVDEP's Water Quality Criteria Meet the CWA's Minimum Requirements

Water quality standards, such as the WVDEP WER-Adjusted Copper Standard, embody important policy decisions about the use of rivers and lakes that are reserved for the states. Congress did not intend for the CWA to usurp the "primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources." 33 U.S.C. § 1251(b). Accordingly, EPA's authority to overrule state decisions on water quality standards is narrowly constrained and governed by a single dispositive criterion: If a water quality standard submitted by a state "meets

the requirements" of the CWA, EPA "shall" notify the state that it is approved; if it does not, EPA "shall" notify the state that it is disapproved. *Id.* § 1313(c)(3); *see also* 40 C.F.R. § 131.21(a).

It is necessary to drill down on what "requirements" state-submitted standards must meet. The regulations provide that EPA's determination "shall be based on" criteria set forth in 40 C.F.R. § 135.1. 40 C.F.R. § 131.21(b).[9] For water quality criteria, § 135.1 requires EPA to determine "[w]hether the State has adopted criteria that protect the designated water uses based on sound scientific rationale consistent with § 131.11." 40 C.F.R. § 131.5(a)(2). Section 131.11 lists three options states have for formulating numeric criteria. The criteria values may be based on (1) EPA's recommended criteria; (2) EPA's recommended criteria "*modified to reflect site-specific conditions*;" or (3) any "[o]ther scientifically defensible methods." 40 C.F.R. § 131.11(b)(1) (emphasis added).

Here, WVDEP's WER-Adjusted Copper Standard was based upon EPA's site-specific WER procedure (promulgated into the State's Water Quality Standards Regulation and approved therein by EPA). The WVDEP WER-Adjusted Copper Standard clearly was developed using a "sound scientific rationale." It may not be the rationale which EPA prefered in this specific instance (for reasons we still don't understand), but there can be no question it is a sound (EPA developed and approved) scientific rationale. This fact compels the Court to overturn EPA's disapproval.

Where the CWA prescribes what decision EPA must make if specified criteria are met, the Agency is not empowered to base its decision on anything other than those criteria. The Supreme Court made this clear in *National Association of Homebuilders v. Defenders of Wildlife*, 127 S. Ct.

---

[9] This regulation also refers to the requirements in 40 C.F.R. § 131.6. That rule lists the "elements" to be included when a state submits water quality standards to EPA, which is not at issue here.

2518 (2007). Construing language in CWA § 402(b), 33 U.S.C. § 1342(b), which is similar to CWA § 303(c), *id.* § 1313(c), at issue here, the Court acknowledged that EPA's determination "involves some exercise of *judgment* as to whether a State has met the criteria," but it was not persuaded that EPA's approval action was therefore made "*discretionary*." *Nat'l Ass'n of Homebuilders*, 127 S. Ct. at 2537 (emphasis added). The Court concluded that if the statutory criteria are satisfied, "EPA does not have the discretion to deny" the state submission. *Id.* at 2531; *see also id.* at 2537 (EPA does not have "discretion to add another entirely separate prerequisite to that list"). In sum, EPA lacks the discretionary authority to disapprove a state water quality standard that satisfies the prescribed statutory and regulatory criteria of the CWA, and EPA cannot base its determination on anything but those criteria.

### 2. EPA's Disapproval of the CSB Copper Standard Was Based on Unlawful Considerations Beyond the CWA Review Criteria

As explained above, the baseline copper criteria for the Kanawha River were based on EPA's recommended nationwide criteria (also called the "304(a) Guidance"), as West Virginia is entitled to do under 40 C.F.R. § 131.11(b)(1)(i). The State also is entitled to establish site-specific criteria that are "based on . . . 304(a) Guidance *modified to reflect site-specific conditions*." 40 C.F.R. § 131.11(b)(1)(ii). West Virginia exercised its prerogative to adopt a process for modifying the default copper criteria. West Virginia selected EPA's WER methodology and codified the process in its water quality standards (including the rare additional public safeguard of legislative rulemaking). As with all water quality standards changes, EPA reviewed and approved West Virginia's adoption of the WER as *the* method for modifying the nationwide recommended copper criteria to site-specific conditions.

WVDEP's WER-Adjusted Copper Standard was derived in compliance with requirements specified in West Virginia's EPA-approved water quality standards regulation for the

establishment of site-specific copper criteria. As discussed above, EPA confirmed this in its June 2014 comments, and EPA's subsequent July 2016 disapproval letter identified no procedural, data-related, or other errors in the WER study. In other words, the State's WER-Adjusted Copper Standard is based on EPA's nationwide recommended criteria modified to site-specific conditions using the EPA-approved WER methodology. No more is required by 40 C.F.R. § 131.11(b)(1)(ii) or, by extension, § 131.5(a)(2) (stating that water quality criteria must "protect the designated water uses based on sound scientific rationale consistent with § 131.11.").

EPA nominally disapproved the CSB Copper Standard because it "would not be protective of West Virginia's [aquatic life designated use] for the Kanawha River." AR 1. The sole stated justification for its position was that EPA generated alternative, site-specific criteria for the Kanawha using the BLM methodology, and the resulting value was less than the WER-based 5.62 result. AR 12. The BLM is not a West Virginia-approved method for deriving site-specific water quality criteria in West Virginia's water quality standards regulation; only the WER is. EPA seeks to have this Court effectively amended W. Va. Code R. § 47-2-8.5 by inserting a new requirement that any site-specific copper criteria based on the WER methodology are not approvable unless they are confirmed by a BLM. This is procedurally and substantively impermissible.

Two copper criteria determinations were obtained—5.62, which EPA acknowledges was validly derived the WER method required by West Virginia's water quality standards regulations and in accordance with 40 C.F.R.§ 131.11(b)(1)(ii), and a result of approximately 2, which was calculated (using only five of eleven inputs based upon actual Kanawha River water quality) by EPA using the unapproved instantaneous BLM. The WER was, *and continues to be*, the sole method EPA has approved for use by West Virginia for the development of site-specific water quality criteria. EPA's charge was to determine whether WVDEP's WER-Adjusted Copper

Standard was validly derived using EPA's recommended, nationwide criteria modified to site-specific conditions using a scientifically defensible method. 40 C.F.R. § 131.11(b)(1)(ii). The record reflects that the WER standard checks all of these boxes. Nevertheless, EPA disapproved the standard based on the Agency's ***preference*** for the result of one (unpromulgated) EPA methodology over another (promulgated) EPA methodology. Section 303(c) of the CWA, 33 U.S.C. § 1313(c), requires EPA to approve state water quality standards if they meet the CWA's minimum requirements—here that it is based upon a sound scientific rationale. The WVDEP WER clearly qualifies as a sound scientific basis given that it is EPA's procedure, is promulgated in the State's Water Quality Standards Regulation specifically for use in developing site-specific criteria, and EPA approved its inclusion in the regulation. Finally, there is no dispute that the WER was properly performed. States do not have to satisfy EPA's preferences but only have a sound scientific basis and the WER clearly satisfies that statutory requirement.. CSB is therefore entitled to judgment in its favor on Count IV.

### C. EPA's Disapproval of the CSB Copper Standard Did Not Observe the Procedure Required by Law

There is no dispute that EPA's review process did not observe the proper procedure. *See* EPA Ans. ¶ 41 (admitting failure to abide by statutory review timelines). CSB is therefore entitled to judgement in its favor on Count V. The only question should be one of remedy for EPA's blatant disregard of the statutorily mandated deadlines.

Section 303(c) of the CWA obligates EPA to make a determination within 60 or 90 days of a state submitting a water quality standard for review. 33 U.S.C. § 1313(c)(3). If it determines that the standards do not meet the CWA's requirements, EPA is then afforded another 30 days to inform the state what changes are necessary to bring the standards into compliance. *Id*.; *see also*

40 C.F.R. § 131.21(a). Nowhere in this tightly written statute is EPA given discretion to unilaterally extend § 303(c)'s timeline so the Agency can develop additional information.

EPA cannot claim in good faith that the delay was necessary or reasonable. The BLM model is a simple software program that can be downloaded from EPA's website.[10] Running the model takes *minutes*. EPA was aware of the WER study from the draft work plan stage in 2013, and during WVDEP's rulemaking to adopt it and then during the Legislature's adoption of the WER-Adjusted Copper Standard through the West Virginia legislative rule process in 2014 and 2015. The data EPA used in its back-of-the-envelope BLM software to generate the BLM value cited in its disapproval came from WVDEP's WER-Adjusted Copper Standard's WER study, AR 11, which was provided to EPA in June 2014 and again in June 2015, AR 895, 1198.

CSB believes this record clearly demonstrates that EPA's last-minute manufacturing of a BLM-based rationale to disapprove the WVDEP's WER-Adjusted Copper Standard is nothing more than a post-hoc rationalization for a decision based on the Agency's inability to obtain concurrence from the U.S. Fish and Wildlife Service—which is not a lawful statutory criteria upon which EPA may base its decision. *See* CSB Mem. Support J. on Pleadings 10–13 (Doc. 7). The Court need not reach the question of EPA's motives, however. Assuming EPA's explanation is in good faith, there is no excuse for EPA's disregard of a statutory deadline to generate a BLM value that it could have prepared easily within its 60-day period to review the WVDEP's WER-Adjusted Copper Standard package–a clock that started on July 25, 2015. CSB submits that the appropriate remedy for EPA's inexcusable disregard of the review procedure mandated by CWA § 303(c) is to vacate its disapproval action and direct it to make a decision on the basis of the record before

---

[10] File can be downloaded from link "2003 Biotic ligand model (BLM) (zip)" at https://www.epa.gov/wqc/aquatic-life-criteria-copper.

the Agency as of the date its determination was statutorily required. While the BLM is an invalid basis for EPA's decision, even if it were relevant, EPA should not be given the benefit of information it developed after the statutory deadline—especially here where they could have easily generated the back-of-the-envelope BLM value well before the deadline. To allow EPA's actions here to go unchecked will reward EPA for its intentional refusal to meet its statutory deadline and incentivize future agency disregard of such deadlines.

## V.  CONCLUSION

For the reasons set forth above, the Charleston Sanitary Board respectfully requests that the Court grant its motion for summary judgment on Counts III, IV, and V of its Supplemental Complaint.

Respectfully submitted,

SANITARY BOARD OF THE CITY OF
CHARLESTON, WEST VIRGINIA

By Counsel:

/s/ F. Paul Calamita_____
F. Paul Calamita (WV Bar No. 8789)
AQUALAW PLC
6 S. 5th Street
Richmond, Virginia 23219
paul@aqualaw.com
(804) 716-9021 (phone)
(804) 716-9022 (fax)

Dated: September 28, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing Memorandum in Support of Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants:

Chloe H. Kolman
Sarah A. Buckley
U.S. Department of Justice
Environmental Defense Section
Suite 800
601 D Street, NW
Washington, DC 20004

Gary L. Call
U.S. Attorney's Office
P.O. Box 1713
Charleston, WV 25326-1713

/s/ F. Paul Calamita_____
F. Paul Calamita

Dated: September 28, 2017